**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

PAUL DION                                          CIVIL ACTION

VERSUS                                             NO. 18-182

W.S. SANDY MCCAIN                                  SECTION: "S"(1)

### SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the amended petitions be **DISMISSED WITH PREJUDICE**.

### State Court Factual and Procedural Background

Petitioner, Paul Dion, is a state prisoner incarcerated at the Raymond Laborde Correctional Center in Cottonport, Louisiana. On February 11, 2010, Dion was charged by a bill of indictment with second degree cruelty to a juvenile in violation of La. Rev. Stat. § 14:93.2.3.[1] On September 16, 2011, petitioner waived his right to a jury trial.[2] On November 15, 2011, petitioner confirmed

---

[1] State Rec., Vol. 1 of 6, Bill of Indictment dated February 11, 2010; minute entry dated February 11, 2010.
[2] State Rec., Vol. 1 of 6, minute entry dated September 16, 2011; State Rec., Vol. 2 of 6, transcript of September 16, 2011.

that he waived his right to a jury trial and a bench trial commenced.[3]  On November 18, 2011, the

trial court found petitioner guilty as charged.[4]  On April 13, 2012, the trial court sentenced

petitioner to thirty years at hard labor without the benefit of probation, parole, or suspension of

sentence.[5]  On direct appeal, petitioner raised the following claims for relief: (2) insufficient

evidence; (2) petitioner did not knowingly and voluntarily waive his right to a jury trial; (3)

ineffective assistance of counsel for failing to (a) file a motion to suppress statements; and (b) call

a neurologist to testify regarding the victim's injuries; (4) the trial court erred in allowing the

physical therapist to bring the victim into the courtroom; and (5) the thirty year sentence was

unconstitutionally excessive.[6]  Petitioner filed a pro se brief attacking the sufficiency of the

evidence and claiming that evidence should have been elicited to show that the victim's mother

was responsible for the victim's injuries or that the victim had a pre-existing condition. [7]  On June

13, 2013, the Louisiana First Circuit Court of Appeal found the ineffective assistance of counsel

issues were not subject to appellate review and that the other issues were meritless and therefore

affirmed petitioner's conviction.[8]  The Louisiana Supreme Court denied writs without stated

reasons on February 14, 2014.[9]  Petitioner did not seek a petition for writ of certiorari with the

United States Supreme Court.

On May 4, 2015, petitioner filed an application for post-conviction relief with the state

district court including a request for production of documents and raising multiple claims of

ineffective assistance of counsel for failing to: (1) subject the state's case to adversarial testing;

---

[3] State Rec., Vol. 1 of 6, minute entry dated November 15, 2011; minute entry dated November 16, 2011; minute entry dated November 17, 2011; State Rec., Vol. 3 of 6, trial transcript of November 15 and 16, 2011; State Rec., Vol. 4 of 6, trial transcript of November 17, 2011; trial transcript of November 18, 2011.

[4] State Rec., Vol. 1 of 6, minute entry dated November 18, 2011; Vol. 4 of 6, trial transcript of November 18, 2011.

[5] State Rec., Vol. 1 of 6, minute entry dated April 13, 2012; Vol. 4 of 8, sentencing transcript of April 13, 2012.

[6] State Rec., Vol. 1 of 6, Appeal Brief, 2012-KA-1962, 2/13/13.

[7] State Rec., Vol. 1 of 6, Pro Se Appeal Brief, 2012 KA 1962, 2/28/13.

[8] State v. Dion, 2012 KA 1962 (La. App. 1st Cir. June 13, 2013); State Rec., Vol. 1 of 6.

[9] State ex rel. Dion v. State, 132 So.3d 403 (La. 2014); State v Dion, 132 So.3d 402 (La. 2014).

(2) object to the admissibility of "other crimes" evidence; (3) present mitigating evidence and use impeachment strategy; (4) file a motion for post judgment of acquittal and motion for new trial; (5) object to the state's failure to present sufficient evidence to convict him; (6) object to improper and unconstitutional instructions; and (7) object to the cumulative effect of the errors.[10]  On May 21, 2015, the state district court denied petitioner's request for production of the trial record.[11] Petitioner filed a notice of intent to seek writs and requested a return date which the state district court set for July 2, 2015.[12]

Petitioner filed a writ application with the Louisiana First Circuit on June 22, 2015.[13]  On September 8, 2015, the First Circuit vacated the state district court order and remanded the matter for further proceedings.[14]

Petitioner refiled a post-conviction application on December 4, 2015.[15]  In his supporting memorandum, he urged different claims including: (1) ineffective assistance of trial counsel for failing to (a) adequately present a defense of actual innocence; (b) present a defense strategy; (c) file a motion for post judgment verdict of acquittal and motion for new trial; (d) object to the trial court's failure to comply with the mandates of sentencing; (e) file a motion to reconsider sentence; and (2) ineffective assistance of appellate counsel for failing to raise insufficiency of the evidence on appeal.[16]  On January 25, 2016, the state district court denied petitioner's application for post-

---

[10] State Rec., Vol. 1 of 6.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  Petitioner certified that he placed his post-conviction application in the mail on May 4, 2015.

[11] State Rec., Vol. 1 of 6, order dated May 21, 2015.

[12] State Rec., Vol. 1 of 6, Notice of Intent and Request for Return Date filed June 4, 2015; order signed June 17, 2015.

[13] State Rec., Vol. 6 of 6, Writ Application, 2015 KW 0998, signed June 22, 2015.

[14] State Rec., Vol. 1 of 6, 1st Cir. Opinion, 2015 KW 0998, dated September 8, 2015.

[15] State Rec., Vol. 1 of 6.

[16] State Rec., Vol. 2 of 6, Memorandum in Support of Application for Post Conviction Relief, 12/15/15.

conviction relief.[17]  On February 3, 2016, petitioner requested a return date by which to file writs.[18]

On February 11, 2016, the state district court set a return date of February 29, 2016.[19]

Petitioner filed his writ application with the First Circuit on February 28, 2016.[20]  He filed

a supplemental application on March 7, 2016.[21]  On May 2, 2016, the First Circuit held:

> **WRIT DENIED IN PART AND DENIED ON THE SHOWING MADE IN PART.**  Relator's claim set forth in his application for postconviction relief is denied.  Relator's additional claims set forth in his supplemental application filed March 7, 2016, are denied on the showing made as relator failed to provide this Court with a copy of the supplemental application for postconviction relief, which presented those claims to the trial court, the trial court's ruling on those additional claims, the bill of information, all pertinent minute entries and/or transcripts, and other portions raised in the supplemental application for postconviction relief. Supplementation of this writ application and/or an application for rehearing will not be considered.  See Uniform Rules of Louisiana Courts of Appeal, Rules 2-18.7 & 4-9.  In the event relator elects to file a new application with this Court, the application must be filed on or before July 29, 2016.  Any future filing on this issue should include the entire contents of this application, the missing items noted above, and a copy of this ruling.[22]

On June 13, 2016, the First Circuit received a second, although identical, writ application

to the one previously filed by petitioner on February 28, 2016 and decided by the Court on May 2,

2016.[23]  On October 12, 2016, the First Circuit denied relief and referred to its action in case

number 2016 KW 0285.[24]

Petitioner filed a writ application with the Louisiana Supreme Court on October 20, 2016.[25]

On November 13, 2017, the Louisiana Supreme Court construed the writ application as relating to

the First Circuit decisions on both May 2, 2016 and October 12, 2016 and denied relief without

---

[17] State Rec., Vol. 2 of 6, Judgment dated January 25, 2016.
[18] State Rec., Vol. 2 of 6, Notice of Intent and Request for Return Date dated February 3, 2016.
[19] State Rec., Vol. 2 of 6, order dated February 29, 2016.
[20] State Rec., Vol. 6 of 6, Writ Application, 2016 KW 0285, signed February 28, 2016.
[21] State Rec., Vol. 6 of 6, Supplemental Writ Application, dated March 7, 2016.
[22] State Rec., Vol. 2 of 6, 1st Cir. Opinion, 2016 KW 0285, dated May 2, 2016.
[23] State Rec., Vol. 5 of 6, Application for Writ, 2016 KW 0794, filed June 13, 2016 (undated by petitioner).
[24] State v. Dion, 2016 KW 0794, 2016 WL 6406375 (La. App. 1st Cir. Oct. 12, 2016); State Rec., Vol. 5 of 6.
[25] State Rec., Vol. 5 of 6, Writ Application, 16 KH 2250, signed October 20, 2016.

stated reasons.[26]  On November 18, 2017, petitioner filed a request for reconsideration.[27]  On February 9, 2018, the Louisiana Supreme Court refused to consider the writ application citing La. S. Ct. Rule IX, §6.[28]

In the interim, petitioner filed another post-conviction application on April 4, 2016 in which he claimed his waiver of the right to a jury trial was not knowing and voluntary.[29]  On April 13, 2016, the state district court denied petitioner's post conviction application finding that petitioner was informed of his right to a jury trial and that he knowingly and voluntarily waived that right.[30]  Petitioner filed a timely notice of intent to seek writs and requested a return date.[31] The state district court set a return date of June 1, 2016.[32]

On April 27, 2016 petitioner filed a writ application with the Louisiana First Circuit Court of Appeal seeking review of the state district court's denial of his second post-conviction application.[33]  On July 29, 2016, the First Circuit denied petitioner's related writ application finding that petitioner's claim that his waiver of a jury trial was not knowing and voluntary was fully litigated on direct appeal and was therefore procedurally barred under La. Code Crim. P. art. 930.4(A).[34]  On November 13, 2017, the Louisiana Supreme Court denied petitioner's related writ application finding no error in the lower courts' rulings under La. Code Crim. P. art. 9304(A) and that his post conviction relief claims had been fully litigated in state court and that he had fully exhausted his right to state collateral review.[35]

---

[26] State ex rel. Dion v. State, 229 So.3d 925 (La. 2017); State Rec., Vol. 5 of 6,
[27] State Rec., Vol. 5 of 6, Application for Rehearing, 16 KH 2250, signed November 18, 2017.
[28] State ex rel. Dion v. State, 236 So.3d 1258 (La. 2018); State Rec., Vol. 5 of 6.
[29] State Rec., Vol. 2 of 6.
[30] State Rec., Vol. 2 of 6, Judgment dated April 13, 2016.
[31] State Rec., Vol. 2 of 6, Notice of Intent to File Writs and Set a Return Date dated April 25, 2016.
[32] State Rec., Vol. 2 of 6, order dated April 29, 2016.
[33] State Rec., Vol. 6 of 6, Application for Writ, 2016-KW-0543, signed April 27, 2016.
[34] State Rec., Vol. 2 of 6, 1st Cir. Opinion, 2016 KW 0543, dated July 29, 2016.
[35] State ex rel. Dion v. State, 229 So.3d 456 (La.); State Rec., Vol. 5 of 6.

On January 2, 2018, petitioner filed his original federal application seeking habeas corpus relief in which he asserted his waiver of the right to a jury trial was not knowing or voluntary.[36] The state filed a response arguing that the application should be dismissed as untimely.[37]  On September 6, 2018, the undersigned recommended that the federal petition be found timely, but that the state court's determination that petitioner knowingly and voluntarily waived his right to a trial by jury was neither contrary to nor an unreasonable application of clearly established federal law and his petition should be dismissed with prejudice.[38]

On September 19, 2018, petitioner filed objections to the report and recommendation.[39] On September 26, 2018, he sought leave to file an amended petition.[40]  On October 18, 2018, United States District Judge Mary Ann Vial Lemmon held in abeyance the report and recommendation and granted leave to file an amended petition.[41]  Petitioner filed a pro se amended petition on November 21, 2018 raising the following ineffective assistance of counsel claims: (1) failure to investigate; (2) failure to call two expert witnesses; (3) use of an unqualified expert; (4) failure to timely file an expert report from Dr. Holder; (5) failure to advise him of the right to testify; and (6) cumulative error.[42]

Petitioner then retained counsel who filed another amended petition alleging ineffective assistance of counsel in failing to: (1) investigate shaken baby syndrome/abusive head trauma; (2) investigate whether the victim was injured in the care of the mother or another person; (3) retain an expert to determine whether there was a presence of chronic subdural hemorrhage prior to the

---

[36] Rec. Doc. 4.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner signed his petition and certificate of service on January 2, 2018.  Rec. Doc. 4, p. 16.
[37] Rec. Doc. 11.
[38] Rec. Doc. 14.
[39] Rec. Doc. 15.
[40] Rec. Doc. 16.
[41] Rec. Doc. 17.
[42] Rec. Doc. 23.

accident; (4) investigate whether the victim had a preexisting condition; (5) impeach the state's expert with a competent expert witness.[43]

Despite being ordered to respond to both amended petitions, the state only addressed the counseled amended petition.[44]  The state concedes that, while petitioner phrased his claims differently before the state courts, he has exhausted the claims of ineffective assistance of counsel for failure to present adequate medical or expert testimony, investigate whether the child was injured by others, investigate shaken baby syndrome, and investigate the possibility of whether a pre-existing condition caused the injuries to the three-month old child.  Giving the petitioner the benefit of a broad interpretation, it also appears that he has exhausted his claims relating to the failure to call two expert witnesses, and cumulative error.  The record, however, demonstrates that petitioner did not previously raise before any state court his claims of ineffective assistance of counsel based on trial counsel's failure to timely file an expert report as well as his failure to advise him of his right to testify.  Nevertheless, petitioner's failure to exhaust these claims does not prevent this court from considering them because he is not entitled to relief. 28 U.S.C. § 2254(b)(2).

In May 2019, the Court received correspondence from petitioner in which he recounted a dispute with his counsel and expressed a desire to file a pro se traverse.[45]  In June 2019, at petitioner's direction, his counsel moved to withdraw from this case.[46]  On July 11, 2019, petitioner filed a pro se traverse simply reiterating his claims of ineffective assistance of counsel.[47]

---

[43] Rec. Doc. 24.
[44] Rec. Docs. 25 and 26.
[45] Rec Doc. 27-1.
[46] Rec. Docs. 27, 31 and 32.
[47] Rec. Doc. 33.

For the reasons set forth below, the Court recommends that the new claims likewise be denied and that the amended petitions be dismissed.

## Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1705 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has

also expressly cautioned that "an unreasonable application is different from an incorrect one."

Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court

precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir.

2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously

unreasonable.").

      While the AEDPA standards of review are strict and narrow, they are purposely so.  As

the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended
> by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court
> relitigation of claims already rejected in state proceedings.  It preserves authority
> to issue the writ in cases where there is no possibility fairminded jurists could
> disagree that the state court's decision conflicts with this Court's precedents.  It
> goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard
> against *extreme malfunctions* in the state criminal justice systems, *not a substitute*
> *for ordinary error correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state court's ruling*
> *on the claim being presented in federal court was so lacking in justification that*
> *there was an error well understood and comprehended in existing law beyond any*
> *possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

      The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein. <u>White</u>, 134 S. Ct. at

1701.

**<u>Facts</u>**

On direct appeal, the First Circuit Court of Appeal summarized the facts of this case as

follows:

> Melissa Thibodeaux lived in Thibodaux and worked as a sitter for elderly people. Melissa and Doris Dion, defendant's mother, cared for the same lady, and it was through Doris that Melissa met the defendant. After briefly dating, in 2008, the defendant moved in with Melissa in her house in Lafourche Parish. At this time, the defendant was unemployed. Later, the defendant began driving trucks for a living. Problems developed in the relationship, and the defendant moved out some time in mid-2008. Melissa testified at trial that she made the defendant leave because he had gotten physically abusive with her. They still saw each other, however, "off and on." In December of 2008, Melissa became pregnant. The defendant was the father of the child. At forty-one years old, Melissa was happy to be pregnant. She had been married several times and had had several miscarriages.

> The defendant was not pleased with the pregnancy and wanted Melissa to have an abortion, which she refused. The defendant made several phone calls to Melissa at home while she was pregnant. Whether Melissa answered and spoke to the defendant or let the defendant leave a message, the defendant's statements and conversations were recorded, and those recordings were introduced into evidence and played for the trial court. On one occasion, the defendant left a message that Melissa was not going to carry that "f— baby" and that something was going to happen to Melissa. In another message, the defendant stated, "go get an abortion if I'm not going to get you shot." In another message, the defendant stated:

>> As far as you and that kid I ain't I ain't paying nothing. I don't wanna have no part of you or that child. I ain't giving you child support I ain't giving you nothing so I hope you gonna have an abortion. I hope something happens to you before you carry that baby too far. Okay bye.

> Two weeks prior to S.D.'s birth, the defendant moved back in with Melissa. Melissa explained at trial that there was no reconciliation between her and the defendant, but she wanted the defendant to learn how to take care of his baby. Melissa gave birth to a boy, S.D. on September 9, 2009. S.D. was born healthy with no medical problems and the first three months of his development were normal. Melissa testified that on Saturday, October 31, 2009, when S.D. was seven weeks old, he was in the defendant's bedroom crying. Melissa took S.D. and brought him to her bedroom. With S.D. still crying, the defendant took the baby, put him in his Jeep Cherokee and drove to his mother's house in Bourg in

11

Terrebonne Parish. Melissa stated it was freezing outside, and the defendant left with S.D. without a blanket, formula, or child seat. Melissa called the police, but they could not help her because the defendant was equally entitled to the custody of his child. Melissa and the defendant had never secured a court-ordered custody agreement. While the defendant kept S.D. at his mother's house over the Halloween weekend, Melissa repeatedly called the defendant to check on S.D. On Monday, the defendant let Melissa come pick up S.D. in Bourg. With the defendant following in his Jeep under the pretense that Melissa would allow the defendant to come back to live with her, Melissa brought S.D. to the house of her parents who lived nearby. When Melissa and the defendant went to Melissa's house, Melissa told the defendant to take his belongings and leave. The next day, Melissa went to speak to an attorney about custody of S.D.

Still with no formal court order, Melissa, the defendant, and their attorneys worked out a temporary visitation arrangement. The defendant was allowed custody of S.D. one day a week and on every other weekend. On Friday, December 11, 2009, the defendant picked up three-month-old S.D. from Melissa's mother's house for the first agreed-upon overnight visit. Melissa testified there was nothing wrong with S.D. when the defendant took custody of him that Friday morning at about 10:00 a.m. and took him to his mother's house, where the defendant was also living. Then on Saturday evening at about 7:00 p.m., the defendant called Melissa on the phone and told her that S.D. had vomited when being fed a bottle. Melissa told the defendant to bring S.D. to her, and the defendant said he was considering that, but it was raining heavily. Several minutes later, Melissa called the defendant again to check on S.D. The defendant told her that S.D.'s leg was shaking. Melissa told the defendant to bring S.D. to her, or she would come to his mother's house with the police. With the rain slackening, the defendant agreed to meet Melissa at Nocko's, a truck stop with a convenience store in Raceland on La. Highway 182.

Between 9:30 p.m. and 10:00 p.m., the defendant met Melissa at Nocko's, where the defendant gave S.D. to her. S.D. was crying. Melissa testified the defendant told her that he probably would not be seeing S.D. for a long time. The defendant then said he was going to buy a beer, which he did at the convenience store. According to Melissa, the defendant had not drunk since the 1990s and she had never seen him drink a beer. Melissa, who was with her mother, drove back to her mother's house and removed S.D. from his car seat. S.D.'s leg and arm were shaking, his eyes were twitching, and his lips were turning blue. Melissa called her doctor who told Melissa to bring S.D. to the hospital. Melissa brought S.D. to Thibodaux Regional Medical Center, where S.D. was treated by emergency room physician Dr. Charles Speights. Dr. Speights testified at trial that S.D. had a low temperature of 95.7 degrees, and he was twitching all over and arching his back. The doctor ordered blood work, a chest x-ray, and a CT scan of the head. The CT scan revealed subdural hematoma, or bleeding on the brain. Upon ruling out several possibilities that might have caused S.D.'s symptoms, Dr. Speights felt it was clear S.D. was suffering from shaken baby syndrome (SBS). S.D. was transported to Children's Hospital, which had a pediatric ICU. While S.D. was intubated in

12

intensive care, Dr. Jamie Jackson, a child abuse pediatrician, conducted a comprehensive physical examination on the infant.  She also consulted with a neurologist and ophthalmologist.  Dr. Jackson testified at trial that S.D.'s eyes were sluggish and minimally reactive and that the symptoms, coupled with his low body temperature, indicated neurological problems.  S.D. did not have palmer (hand) or plantar (feet) reflexes.   The ophthalmologic findings were diffuse retinal hemorrhages consistent with centripetal force injury.  The doctor explained that centripetal force, which involves rotation and forward and backward motion, is the typical force related with SBS.  Dr. Jackson further testified that S.D. had some rib fractures of the right seventh and possibly the fifth and sixth.  The doctor stated that in infants, rib fractures alone are indicative of physical abuse since it is really difficult for an infant to get a rib fracture.  Dr. Jackson testified that S.D. had significant, permanent injuries as a result of being shaken and that developmental delays may become worse.

Dr. Kenneth Cruse, S.D.'s pediatrician, testified at trial that S.D. was born a normal baby with no neurological problems.  After seeing S.D. in January of 2010, Dr. Cruse stated that he agreed with Children's Hospital's diagnosis of SBS According to Dr. Cruse, S.D. will always have significant neurological impairments, but as he gets older may have some form of ambulation with the assistance of a walker.  Dr. Cruse did not expect S.D. ever to be able to ambulate normally.

Michele Bower, a pediatric physical therapist, testified at trial that she was S.D.'s physical therapist and has worked with him one hour a week for two years.  At trial, Bower removed S.D. from his $7,000 custom wheelchair and showed the trial court some of the physical therapy S.D. undergoes, which includes a lot of stretching.  Bower stated that at twenty-six months old, S.D. can say some words, like "good" or "out."  She explained that S.D. always looks to the right because he uses the muscles on one side of his body better that the other side.  She further explained that at this age, S.D. should be walking around, kicking a ball, climbing steps, and playing with toys, but instead S.D. was working on sitting.  Bower stated that on a good day, S.D. could sit up for about thirty seconds.  She added that S.D. could not stand or crawl, and he could not reposition himself when lying down.  She also stated that S.D. wore leg braces and used a gait trainer, which enables him to stand up straight.  Bower expected S.D.'s substantial impairments in speech and mobility were permanent.

Dr. Mark Holder, an internist, testified for the defense.  Dr. Holder stated that he had reviewed S.D.'s medical records.  His first time testifying as an expert, Dr. Holder stated that he had in the past treated children for SBS and that he agreed with S.D.'s diagnosis of SBS.  S.D.'s CT scan of his head was taken on Sunday, December 13, 2009 at 7:42 a.m.  The radiology report on this scan stated: "Impression changes consistent with subacute massive cerebral anoxia, small subdural hemorrhages."  Dr. Holder explained that "subacute" meant there was a period of 72 hours to several weeks from when the injury occurred (the shaking) to

13

when the CT scan was taken. Thus, according to Dr. Holder, S.D.'s symptoms did not necessarily have to show up within hours of the injury. On cross-examination, Dr. Holder was asked if he agreed with Dr. Jackson's assessment that S.D.'s injury had to have occurred within close proximity to when the defendant noticed S.D.'s leg shaking. Dr. Holder responded that he agreed with the testimony "in general." The prosecutor played for Dr. Holder the defendant's recorded statement to the police, which Dr. Holder had not heard. After viewing the transcript of the recorded statement, Dr. Holder agreed that it contained important history and further, that the history was not consistent with a baby who suffered the amount of trauma S.D. suffered thirty-five hours before the twitching. The following exchange between the prosecutor and Dr. Holder then took place:

> Q. Okay. So the history that we just saw, which you didn't have the benefit of when you made your opinion?
> A. Correct.
> Q. So the report that you wrote said: In my opinion this trauma happened before 9:00 a.m. on Friday morning. Correct?
> A. Correct.
> Q. After having seen this history, that is no longer your opinion, is it?
> A. It's not compatible with the medical findings, correct.
> Q. I know. And I know this is tough. That's not your opinion any more after you saw this history, is it?
> A. It – It's not typical.
> Q. Okay. Third time's got to be the charm. Look, this is serious. All right? I know that this history is thorough, complete, and it's in-depth and it is not consistent with a baby that suffered the type of trauma that caused this permanent damage, correct?
> A. Correct.
> Q. So the trauma had to occur after 9:00 a.m. on Friday?
> A. Based on the history, correct.

On the redirect examination of Dr. Holder, by defense counsel, the following rehabilitative exchange took place:

> Q. I'm still missing, Doctor, what you saw that had you change your opinion from the CT scan said the injury as shown on that CT scan was subacute and therefore had probably occurred 72 hours prior to that CT scan. Are you changing that opinion?
> A. Based on the CT scan alone, I'm not changing my interpretation of the CT scan.
> Q. Okay.
> A. The CT scan clearly states subacute.
> Q. Which means 72 hours prior?
> A. Yes, sir.

Sergeant Shane Fletcher, with the Terrebonne Parish Sheriff's Office, testified at trial that he was the lead investigator on this case and that he had interviewed the defendant. The interview was recorded, and the DVD of the recording was introduced into evidence and played for the trial court. Upon being **Mirandized** and signing an advice of rights form, the defendant informed Sergeant Fletcher that S.D. was happy when he picked him up Friday morning, everything was fine for the rest of the day Friday, and S.D. looked good when he (S.D.) woke up Saturday morning. Saturday evening S.D. drank two ounces of his formula and threw it up. According to the defendant, after several minutes, he fed S.D. the other two ounces in his bottle, and S.D. kept that down. S.D. then began crying "hard" and his leg started shaking. He called Melissa and told her something was wrong with S.D. A short time later, S.D.'s arm began shaking and his eyes were twitching. When the heavy rain abated, he met Melissa at Nocko's to give S.D. to her. The defendant denied that he shook S.D. or hurt him in any way. The defendant informed Sergeant Fletcher that he was the only person which handled S.D. at his mother's house. The defendant's mother testified at trial that the people living at her house when S.D. was over there were her sister, her husband, and the defendant. She confirmed that no one in her house, including herself, handled S.D. except for the defendant. When asked during the interview about the beer he purchased, the defendant denied it. After being told there was video footage, the defendant admitted he purchased a beer and could not explain to Sergeant Fletcher why he had lied.

The defendant did not testify.[48]

## Petitioner's Claims

In his two amended petitions, Dion makes various overlapping claims that he received ineffective assistance of counsel. He claims his counsel was ineffective in failing to: (1) investigate shaken baby syndrome as well as the possibility of others causing the injuries, and whether the victim had a pre-existing condition; (2) call Dr. Gimenez and Dr. Haymon to testify at trial; (3) retain experts and utilize them to impeach the state's experts; (4) utilize a qualified expert; (5) file a timely expert report; and (6) advise him regarding his constitutional right to testify. He also claims cumulative error.

The United States Supreme Court established a two-prong test for evaluating ineffective assistance of counsel claims. Specifically, a petitioner seeking relief must demonstrate that

---

[48] State v. Dion, 2012 KA 1962, at pp. 2-8 (La. App. 1st Cir. June 13, 2013); State Rec., Vol. 1 of 6.

counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 697. The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid.</u>  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

Petitioner first claims that his trial counsel failed to investigate shaken baby syndrome, whether the victim was injured in the care of others, including the mother, and whether the victim had a pre-existing medical condition.  Contrary to petitioner's claims regarding his trial counsel's

failure to investigate, the evidence of record demonstrates that petitioner's expert witness, Dr. Holder, reviewed all the records from Thibodeaux's obstetrician/gynecologist to determine the existence of any prenatal complications, the records from the pediatrician, and the records of Thibodaux Regional Medical Center from the time of the victim's birth through the date of the victim's injury, and that Dr. Holder found no evidence to indicate any prior problem.[49]  Dr. Blaise, Thibodeaux's obstetrician, testified that Thibodeaux had a normal pregnancy and delivery, that all the tests prior to delivery indicated that the baby was normal, and that the baby appeared normal at the time of birth.[50]  Dr. Cruse, the victim's pediatrician since birth, testified that there were no abnormalities or neurological problems from the time of birth until he last saw him at an appointment on an unspecified date but shortly before December 12, 2009.[51]  Further, the evidence of record, including petitioner's statement to police, demonstrates that the victim appeared to be in good health when petitioner picked him up from Thibodeaux and no one other than petitioner handled the victim until after he started showing symptoms of vomiting, spasms, and listlessness, after which petitioner delivered him to Thibodeaux who ultimately took the victim to the hospital.[52]

Moreover, in any event, even if petitioner had made a showing that his counsel failed to investigate, he would then additionally have to prove that prejudice in fact resulted from the inadequate investigation.  To make that showing, he must point to evidence in the record demonstrating that further investigation would have revealed additional information beneficial to the defense.  See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v.

---

[49] Rec. Doc. 23-1, pp. 1, 3; State Rec. Vol. 4 of 6, trial transcript of November 17, 2011, pp. 712-714.
[50] State Rec., Vol. 3 of 6, trial transcript of November 15, 2011, pp. 126-129.
[51] Id., at pp. 264-65.
[52] Id., at pp. 133-35, 141-53, 210, 221, 227; State Rec., Vol. 3 of 6, trial transcript of November 16, 2011, pp. 289, 298-99, 313, 445-49, 538-59, 561-610; State Rec., Vol. 4 of 6, trial transcript of November 17, 2011, pp. 674, 679-82.

Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL

2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ.

Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008). Again, he has not done

so. Petitioner presents no evidence that Thibodeaux or any person other than himself inflicted the

injuries on the victim and *all* the experts agreed that the victim suffered from shaken baby

syndrome.

   Petitioner next contends that his counsel was ineffective for failing to call Dr. Carlos

Gimenez and Dr. Marie Haymon and to retain an expert, such as a pediatric neurologist, to

determine whether there was a pre-existing condition such as a chronic subdural hemorrhage or

seizure disorder.

> As the United States Fifth Circuit Court of Appeals has explained:
>
> Claims that counsel failed to call witnesses are not favored on federal habeas review
> because the presentation of witnesses is generally a matter of trial strategy and
> speculation about what witnesses would have said on the stand is too uncertain. For
> this reason, *we require petitioners making claims of ineffective assistance based on
> counsel's failure to call a witness to demonstrate prejudice by naming the witness,
> demonstrating that the witness was available to testify and would have done so,
> setting out the content of the witness's proposed testimony, and showing that the
> testimony would have been favorable to a particular defense. This requirement
> applies to both uncalled lay and expert witnesses.*

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added; citations, quotation marks,

and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail

on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must

name the witness, demonstrate that the witness was available to testify and would have done so,

set out the content of the witness's proposed testimony, and show that the testimony would have

been favorable to a particular defense."). The Fifth Circuit has "required this showing for claims

regarding uncalled lay and expert witnesses alike." Id., at 538 (citing Evans v. Cockrell, 285 F.3d

370, 377-78 (5th Cir. 2002) (emphasis added).  The Fifth Circuit has "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.' "  Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting Woodfox, 609 F.3d at 808).  Further, there must be a " 'reasonable probability' that the uncalled witnesses would have made [a] difference to the result."  Alexander v. McCotter, 775 F.2d 595, 603 (5th Cir. 1985) (citation omitted).

Petitioner has not met the foregoing requirements necessary to successfully assert such claims.  While the record establishes that subpoenas were served on Dr. Gimenez from Children's Hospital and Dr. Haymon from Thibodaux Regional Medical Center, and the trial transcript reflects that they were "on standby waiting on a call" from defense counsel,[53] petitioner presented no evidence, such as affidavits from Dr. Gimenez or Dr. Haymon that they would in fact have testified in a manner beneficial to the defense.  Nor has he presented any evidence from a pediatric neurologist demonstrating that one was available and willing to testify at the trial and that such testimony would be favorable to petitioner.  In fact, petitioner's trial counsel stated that "[a]ll the information he received was that no diagnosis could be made after the brain injury."[54]

Therefore, petitioner obviously failed to meet his burden of proof with respect to these claims.  See, e.g., Cox v. Stephens, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court

---

[53] State Rec. Vol. 1 of 6, subpoena dated April 8, 2011; subpoena dated April 8, 2011; Vol. 3 of 6, trial transcript of November 15, 2011, p. 16.
[54] Rec. Doc. 23-1, p. 3.

may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Next, petitioner faults his counsel for filing an untimely expert report and for utilizing an "unqualified" expert.  Defense counsel disclosed Dr. Holder as an expert witness on October 27, 2011.[55]  Apparently, thereafter, on November 9, 2011, the trial court held a conference in chambers during which time the parties argued whether Dr. Holder could testify without issuing an expert report.[56]  Over the defense's objections, the trial court ordered that Dr. Holder would not be allowed to testify unless the defense delivered a report from Dr. Holder to the state no later than 2:00 p.m. on November 11, 2011.[57]  Defense counsel provided the prosecution with a report from Dr. Holder on November 11, 2011, as ordered by the trial court.[58]  In his report, Dr. Holder opined that "the trauma that caused the subacute massive cerebral anoxia and subdural hemorrhages probably occurred prior to 9:00 a.m. on Friday, December 11, 2009.[59]

At trial, the prosecution informed the trial court of its intention to object to Dr. Holder's testimony as the report did not include a basis for his opinion.[60]  The trial court deferred ruling on

---

[55] State Rec., Vol. 1 of 6, answer to state's motion to discovery dated October 27, 2011.
[56] State Rec., Vol. 1 of 6, motion dated November 10, 2011.
[57] Id.
[58] State Rec., Vol. 1 of 6, report of Dr. Holder dated November 11, 2011.
[59] Id.
[60] State Rec., Vol. 3 of 6, trial transcript of November 15, 2011, pp. 18-31

the objection.[61]   After preliminary questioning regarding his background and expertise, the trial

court qualified Dr. Holder as an expert in the fields of internal medicine and emergency room

medicine.[62]   Dr. Holder was permitted to testify extensively regarding his opinion, including that

the victim suffered from shaken baby syndrome, that the radiology report findings indicated

"subacute massive cerebral anoxia," and that there can be a variation in the timing of the

occurrence of symptoms in relation to the injury. [63]   He explained that "subacute" typically means

there was a period of 72 hours to several weeks when the injury occurred to when the CT scan was

taken.[64]   On cross-examination, after viewing the police video interview of petitioner, which

included a detailed history of the victim's behavior from the time petitioner picked him up from

Thibodeaux to the time he returned the victim, Dr. Holder opined that, based on the history

provided, the trauma occurred after 9:00 a.m. on Friday, December 11, 2009.[65]   He, however,

testified that based on the CT scan alone, he had not changed his opinion regarding the definition

of "subacute" as it was used in the interpretation of the scan, but that there was clearly a deviation

between the history provided by petitioner and the findings in the CT scan report.[66]

As Dr. Holder was permitted to testify despite the late disclosure of his expert report,

petitioner has failed to demonstrate any prejudice.  Additionally, petitioner has failed to show that

Dr. Holder was "unqualified" to provide expert testimony.  As explained above, the trial court

qualified Dr. Holder as an expert in the fields of internal medicine and emergency room medicine

and permitted him to testify regarding his medical opinions.  While Dr. Holder is not a pediatric

neurologist, again, as explained previously, petitioner has not demonstrated that one was available

---

[61] Id., at p. 30.
[62] State Rec., Vol. 4 of 6, trial transcript of November 17, 2011, pp. 691-712.
[63] Id., at pp. 716-741.
[64] Id., at pp. 725-27.
[65] Id., at pp. 748-83.
[66] Id., at pp. 786-90.

or that any other medical expert was available and would have testified in a manner which would have had a reasonable probability in altering the verdict. He is not entitled to relief as to this claim.

Petitioner also faults his trial counsel for failing to impeach the state's experts regarding the "causation" and "timing of trauma." To the extent that petitioner again claims that no expert reviewed Thibodeaux's prenatal and birth records and the victim's pediatric records from birth until the time of his injuries, that allegation is simply false. As previously explained, Dr. Holder testified that he reviewed all the records.

To the extent that petitioner is simply arguing that defense counsel could have more effectively cross-examined the state's experts, petitioner has not made that showing. He has identified no critical flaws in the cross-examination. Petitioner's trial counsel questioned Dr. Speights about the diagnosis of shaken baby syndrome and the timing of the injuries.[67] His trial counsel also extensively cross-examined Dr. Jackson about the possibility of persons other than petitioner inflicting the injuries, the clinical findings, and the timing of the injuries.[68] Furthermore, the evidence of petitioner's guilt, including Thibodeaux's testimony, the threats petitioner previously made to her during her pregnancy, Dion's statement to police which provided his version of the timeline relative to when the victim's symptoms first occurred, and the fact that petitioner, who had not consumed alcohol in 20 years, lied to police about purchasing a beer after he returned the victim to Thibodeaux, was overwhelming. Simply put, petitioner's claim fails because there is no reasonable probability that a different verdict would have resulted if only counsel's cross-examination of the state's expert witnesses had been more effective. See, e.g., Day v. Quarterman, 566 F.3d 527, 539-40 (5th Cir. 2009) (rejecting as speculative and conclusory

---

[67] State Rec., Vol. 3 of 6, trial transcript of November 16, 2011, pp. 296-99.
[68] Id., at pp. 344-414.

an ineffective assistance claim arguing that defense counsel failed to challenge adequately the testimony of the state's medical experts through cross-examination).

It is apparent from the record that the defense agreed that the victim suffered from shaken baby syndrome, but argued that the injuries occurred earlier and that the petitioner was not the person who inflicted the injuries. The fact that his defense was not successful and Dion was convicted does not mean that counsel's actions were deficient. See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir. 2004). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted).

Dion's next claim is that his counsel failed to advise him of his constitutional right to testify at trial. He also claims that, when he informed his counsel prior to trial that he wanted to testify, counsel threatened to withdraw.

It is well settled that a criminal defendant has the right to testify on his own behalf pursuant to the Fifth, Sixth and Fourteenth Amendments. Rock v. Arkansas, 483 U.S. 44, 44, 107 S.Ct. 2704, 97 L.Ed. 2d 37 (1987); Bower v. Quarterman, 497 F.3d 459, 473 (5th Cir. 2007); Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir. 2001); Jordan v. Hargett, 34 F.3d 310, 312 (5th Cir. 1994). A defendant can only waive his right to testify if that waiver is knowing, intelligent and voluntary. Bower, 497 F.3d at 473 (citing Emery v. Johnson, 139 F.3d 191, 198 (5th Cir. 1997)). A violation of this right occurs only if the " 'final decision that [the defendant] would not testify was made against his will.' " Emery, 139 F.3d at 198 (quoting United States v. Teague, 908 F.2d 752, 759 (11th Cir. 1990), reh'g granted, 953 F.2d 1525 (11th Cir.), cert. denied, 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed. 2d 82 (1992)).

A habeas petitioner has the burden of proving that he was denied this constitutional right. It is not enough for a habeas petitioner to merely state that he told his trial attorney that he wanted to testify and that his attorney forbade him doing so.  Turcios v. Dretke, No. H-97-0515, 2005 WL 3263918, at *6 (S.D. Tex. 2005) (citing Underwood v. Clark, 939 F.2d 473, 475–76 (7th Cir. 1991)); accord Jones v. Cain, Civil Action No. 10-213, 2010 WL 5375949, at *3 (E.D. La. Dec. 17, 2010) (Vance, J.); Davis v. Quarterman, Civil Action No. H-06-3606, 2007 WL 1886272, at *6 (S.D. Tex. June 29, 2007).  The United States Seventh Circuit Court of Appeals in Underwood specifically noted the potential problems likely to arise if habeas petitioners, making similar arguments, are not required to satisfy the required burden of proof.  939 F.2d at 475–76.  Adopting the reasoning in Siciliano v. Vose, 834 F.2d 29, 31 (1st Cir. 1987), the Underwood Court recognized that such an assertion, even if made under oath, was inadequate to meet that burden:

> [T]his barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him.  It just is too facile a tactic to be allowed to succeed.  Some greater particularity is necessary—and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Id., 939 F.2d at 475–76 (citations omitted); accord Gross v. Knight, 560 F.3d 668, 672 (7th Cir. 2009).

Citing Underwood, the Fifth Circuit has also indicated the same concerns:

> Courts have observed that allowing a bare assertion of a right-to-testify violation to precipitate the further investment of judicial resources is problematic.  See [Underwood, 939 F.2d at 476] ... (stating that a conclusory assertion by a defendant that his right to testify was denied him is insufficient to require a hearing because "[I]t just is too facile a tactic to be allowed to succeed").  We agree that there is "a grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right ... to testify in his own behalf without rendering the criminal process unworkable."

United States v. Martinez, 181 F.3d 627, 628 (5th Cir. 1999) (quoting Underwood, 939 F.2d at 475).

Petitioner has not presented anything but his unsupported claim that his counsel would not allow him to testify or threatened to withdraw if he attempted to do so. The record also contains nothing to support his claim. The transcript is devoid of any discussion on the record by Dion or his counsel that Dion wished to testify or was advised against it.[69] Dion's argument, therefore, is in the same posture as that invalidated and rejected in the Underwood case. There is nothing in this record sufficient to prove any violation of his right to testify.

Furthermore, even assuming that his counsel denied him the right to testify, Dion fails to show that there is a reasonable probability that his testimony would have altered the verdict. On the stand, Dion would have been exposed to cross-examination regarding his guilt and character, including the threats he made to Thibodeaux prior to the victim's birth, his statements to Thibodeaux made after the victim's injuries that he would not be seeing him again soon, and the lies he told police when he was questioned, which would have diminished his credibility. The prejudice posed by the likely cross-examination outweighed any benefit his unsubstantiated testimony could have lent to his defense. For these reasons, Dion is not entitled to relief on this claim.

Lastly, petitioner argues that even if his separate contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted if they are considered cumulatively. He is incorrect. Where, as here, a petitioner has failed to show that his counsel was ineffective in any respect, "there is nothing to cumulate." Villaneuva v. Stephens,

---

[69] The record reflects that after Dr. Holder completed his testimony, defense counsel sought a "five- or ten-minute opportunity to talk to [Dion]." State Rec., Vol. 4 of 6, trial transcript of November 17, 2011, p. 790. Court resumed after a 26 minute recess and the defense rested. Id., at p. 791.

555 Fed. App'x 300, 308 (5th Cir. 2014); accord United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland."); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised'. We agree."); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."). As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero." Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987). Accordingly, Dion's claim of cumulative error should be denied.

For all of these reasons, it is clear that Dion has not demonstrated that the state courts' decision rejecting his exhausted ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor has he established any violation of Strickland with regard to his unexhausted ineffective assistance of counsel claims.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the amended federal applications for habeas corpus relief filed by Paul Dion be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  21st  day of August, 2019.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**